Citation Nr: 1334648 
Decision Date: 10/30/13 Archive Date: 11/06/13

DOCKET NO. 99-11 196A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO) 
in San Juan, the Commonwealth of Puerto Rico


THE ISSUES

1. Entitlement to service connection for hypertension.

2. Entitlement to a total disability evaluation based upon individual unemployability due to service-connected disabilities (TDIU). 

3. Entitlement to service connection for neuropathy of all four extremities as secondary to the Veteran's service connected back disability. 

4. Entitlement to service connection for disc bulges at C3-C4, C4-C5, and C5-C6 (cervical condition or "neck disability"), as secondary to the Veteran's service connected back disability. 

5. Entitlement to service connection for erectile dysfunction as secondary to the Veteran's service connected back disability. 
 
6. Entitlement to service connection for urinary incontinence as secondary to the Veteran's service connected back disability. 

7. Entitlement to service connection for right knee disability as secondary to the Veteran's service connected back disability. 

8. Entitlement to service connection for a left knee disability as secondary to the Veteran's service connected back disability. 


REPRESENTATION

Veteran represented by: Jonathan Bruce, Esq.


ATTORNEY FOR THE BOARD

Matthew Blackwelder, Counsel


INTRODUCTION

The Veteran had active service from November 1973 to November 1975, from March 1976 to November 1976, and from June 1992 to March 1994. He also had periods of active duty for training (ACDUTRA) and inactive duty for training (INACDUTRA). 

The issue of service connection for hypertension, initially arose from a May 2000 rating determination of the Department of Veterans Affairs (VA) Regional Office (RO) located in San Juan, Puerto Rico. 

In October 2005, the Board, in pertinent part, denied the claim of service connection for hypertension. The Veteran appealed to the Court, and the decision was vacated pursuant to a joint motion for remand (JMR). 

In April 2010, the Board observed that in March 2000, the Veteran submitted an August 1996 Line of Duty determination from the Puerto Rico National Guard regarding his hospitalization for hypertension during an ACDUTRA period, and that thereafter, the RO received copies of missing service treatment records (STRs) for the Veteran's period of active service from June 1992 to March 1994. 

Therefore, pursuant to 38 C.F.R. § 3.156(c)(1), the Board concluded that the Veteran was entitled to have his hypertension claim reviewed on a de novo basis. 

With regard to the claim for a TDIU, the Board, in its October 2010 decision, noted that the Veteran had raised the issue of entitlement to TDIU, pursuant to Rice v. Shinseki, 22 Vet. App. 447, 453-54 (2009). 

The issues of cervical spine, knees, erectile dysfunction, urinary incontinence, and neuropathy of all four extremities arose out of an April 2012 rating decision.

The development directed by the Board's December 2011 remand has been completed, and because the Board's order was fully complied with, there is no prejudice for the Board to proceed. See Stegall v. West, 11 Vet. App. 268 (1998). 

The Board must note that in reviewing this case the Board has not only reviewed the Veteran's physical claims file, but also his file on the "Virtual VA" system to insure a total review of the evidence. 

In April 2010, the Board denied (1) a rating in excess of 40 percent for L4-L5 and L5-S1 spondylosis with associated small central herniated nucleus pulposus with degenerative disc disease and lumbar myositis (i.e. a back disability) and (2) a compensable rating for otitis externa and otomycosis. In doing so, the Board considered all of the evidence of record. 

The Veteran did not appeal the Board's decision to the Court. 

In May 2012, the RO inexplicably issued a supplemental statement of the case with regard to the issues of increased ratings for back and otitis/otomycosis, and denied service connection for a cervical spine disability. It is noted that in reviewing the adjudicative actions cited by the RO as prompting the supplemental statement of the case, the November 2008 statement of the case was listed, which addressed the very issues by the Board in the April 2010 rating action. 

Importantly, the Board's decision on those two issues ceded jurisdiction over those issues away from the RO. Therefore, to initiate a claim for an increased rating, the Veteran would have to file a new claim with the RO. 

Here, the Veteran has not actually alleged that either his back or otitis has worsened since the Board finally adjudicated them. Accordingly, to the extent that issues for increased ratings for back and otitis were listed on an supplemental statement of the case they are dismissed. These issues are not before the VA at this time. 

To the extent that the Veteran has identified his back disability in his May 2011 statement, the Board refers that issue to the Agency of Original Jurisdiction (AOJ) for appropriate action, if needed. 
 
The issues of TDIU and neuropathy of the extremities are addressed in the REMAND portion of the decision below and are REMANDED to the RO via the Appeals Management Center (AMC), in Washington, DC.


FINDINGS OF FACT

1. The Veteran's hypertension was not shown to have either begun during or have been was otherwise caused by either of his first two stints on active duty, to have been diagnosed within a year of either stint, or to have been continuous from either period of service.

2. Hypertension was clearly noted on the enlistment physical prior to the Veteran's third period of active duty service, and he has not met his burden to show that it was not permanently aggravated by this third period of service.

3. Hypertension was not shown to have been permanently aggravated during a period of active duty for training.

4. The Veteran's cervical spine disability is not shown to have either began during or been otherwise caused by his military service; nor does the evidence establish that it is secondary to his service connected back disability.

5. The weight of the evidence makes it less likely than not that the Veteran's erectile dysfunction began during or was otherwise caused by his military service; or is secondary to his service connected back disability.
 
6. The Veteran is not shown to have a disability manifested by urinary incontinence.
 
7. The Veteran was first diagnosed with arthritis (manifested to at least 10 percent) in his knees either in service or within a year of service. 

8. The Veteran's meniscus tear in his right knee has not been shown to have occurred during or as a result of active duty, active duty for training, or inactive duty for training.






CONCLUSIONS OF LAW

1. Criteria for service connection for hypertension have not been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1131, 1137 (West 2002); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2013). 

2. Criteria for service connection for a cervical spine condition, to include as secondary to the Veteran's service connected back disability, have not been met. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. §§ 3.303, 3.310 (2013). 

3. Criteria for service connection for erectile dysfunction, to include as secondary to the Veteran's service connected back disability, have not been met. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. §§ 3.303, 3.310 (2013). 

4. Criteria for service connection for a urinary incontinence, to include as secondary to the Veteran's service connected back disability, have not been met. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. §§ 3.303, 3.310 (2013). 

5. Criteria for service connection for arthritis of the right knee have been met. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. §§ 3.303, 3.310 (2013). 

6. Criteria for service connection for residuals of a meniscal tear of the right knee have not been met. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. §§ 3.303, 3.310 (2013). 

7. Criteria for service connection for a left knee disability have been met. 38 U.S.C.A. §§ 1110, 1131 (West 2002); 38 C.F.R. §§ 3.303, 3.310 (2013). 






REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Service Connection

In seeking VA disability compensation, a Veteran generally seeks to establish that a current disability results from disease or injury incurred in or aggravated by service. 38 U.S.C.A. §§ 1110, 1131. "Service connection" basically means that the facts, shown by evidence, establish that a particular injury or disease resulting in disability was incurred coincident with service in the Armed Forces, or if preexisting such service, was aggravated therein. 38 C.F.R. § 3.303.
 
The term "active military, naval or air service" is further defined as (1) active duty or a period of ACTDUTRA during which the individual concerned was disabled or died from a disease or injury incurred or aggravated in line of duty, and (2) any period of INACTDUTRA during which the individual concerned was disabled or died from an injury incurred or aggravated in line of duty. See 38 U.S.C.A. § 101(24). Service connection for disability arising from inactive duty training is permitted only for injuries, not diseases, incurred or aggravated in the line of duty, (with the exceptions for acute myocardial infarction, a cardiac arrest, or a cerebrovascular accident, not pertinent here). See Brooks v. Brown, 5 Vet. App. 484, 485 (1993). 

Service connection may be established under 38 C.F.R. § 3.303(b), if a chronic disease or injury is shown in service, and subsequent manifestations of the same chronic disease or injury at any later date, however remote, are shown, unless clearly attributable to intercurrent causes. For a showing of a chronic disorder in service, the mere use of the word chronic will not suffice; rather, there is a required combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time.

Service connection may also be established under 38 C.F.R. § 3.303(b), where a condition in service is noted but is not, in fact, chronic, or where a diagnosis of chronicity may be legitimately questioned. The continuity of symptomatology provision of 38 C.F.R. § 3.303(b) has been interpreted as an alternative to service connection only for the specific chronic diseases listed in 38 C.F.R. § 3.309(a). See Walker v. Shinseki, 718 F.3d 1331 (Fed. Cir. 2013).

Secondary service connection may be granted for a disability which is proximately due to, or the result of, a service-connected disorder. 38 C.F.R. § 3.310(a). Secondary service connection may be found in certain instances in which a service-connected disability aggravates another condition. 

Hypertension

For VA purposes, hypertension or isolated systolic hypertension must be confirmed by readings taken two or more times on at least three different days. The term hypertension means that the diastolic blood pressure is predominantly 90mm. or greater, and isolated systolic hypertension means that the systolic blood pressure is predominantly 160mm. or greater with a diastolic blood pressure of less than 90mm. 38 C.F.R. § 4.104, Diagnostic Code 7101, NOTE (1).

 It is not disputed that the Veteran has hypertension; and hypertension is listed as a "chronic disease" under 38 C.F.R. § 3.309(a); therefore, 38 C.F.R. § 3.303(b) applies. Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013) (holding that the "chronic" in service and "continuous" post-service symptom presumptive provisions of 38 C.F.R. § 3.303(b) only apply to "chronic" diseases at 3.309(a)). The issue is therefore when the Veteran's hypertension began and whether it was caused by his military service.

As noted above, the Veteran had three periods of active military service: November 1973-November 1975, March 1976-November 1976, and June 1992-March 1994.

In October 1995, the Veteran first filed a claim for hypertension, this claim was denied by the Board, but ultimately the claim was reconsidered based on the submission of additional service treatment records. In March 1996 the Veteran asserted that his hypertension had begun while in service with the Puerto Rican National Guard. However, as noted above, developing a disease while in the National Guard alone is not sufficient to merit service connection. Rather, the disease must be shown to have begun either during active duty or during active duty for training.

In May 1998, the Veteran testified at a hearing before the Board that he first had problems concerning his blood pressure in approximately 1975 when he was preparing for discharge from the service. The Veteran denied having any elevated blood pressure prior to his separation physical. He asserted that they took readings for approximately two days. He indicated that he began receiving treatment for blood pressure approximately 4-5 years after his initial separation, around 1979 or 1980, from his family physician. He later stated that he started getting medical treatment for high blood pressure in approximately 1989 or 1990 at VA. The Veteran indicated that when he reenlisted into the National Guard, his blood pressure was monitored, and then he was accepted.

Service treatment records show that at a separation physical in October 1975, the Veteran had blood pressure of 130/80 and no hypertension was suggested. At enlistment into his second period of service, the Veteran denied any high blood pressure in March 1976. In April 1976 the Veteran complained of frontal headaches and loss of vision and his blood pressure was 132/90. However, in September 1976, the Veteran's blood pressure was 124/72, and no hypertension was diagnosed, although the Veteran noted that he was unsure if he had high or low blood pressure. In November 1976, the Veteran's blood pressure was 140/90. At a VA examination in February 1977, the Veteran's blood pressure was 110/70. A physical in March 1979 did not find hypertension and his blood pressure was 130/84 at that time. The Veteran also specifically denied any history of high blood pressure on a medical history survey completed in conjunction with his separation physical. 

As such, service treatment records do not show any complaints of, or treatment for, elevated blood pressure, and the Veteran routinely denied any history of high blood pressure on medical history surveys completed during the course of his military service, providing highly probative factual evidence against his own claim. 

Moreover, hypertension is not shown to have been diagnosed for a number of years after the initial two periods of service (as acknowledged by the Veteran himself at a previous Board hearing). It is true that the Veteran's diastolic blood pressure was periodically at 90 during service. However, as noted, for elevated blood pressure to be considered hypertension, the diastolic blood pressure must be predominantly 90mm. or greater. Additionally, the hypertension must be confirmed by readings taken two or more times on at least three different days. Here, the Veteran periodically showed diastolic readings of 90, but the subsequent tests were consistently found to be in the normal range. 

The Board did obtain a medical opinion of record to address the periodic elevated diastolic readings. Specifically, the Veteran underwent a VA examination in June 2012. The Veteran asserted that at his separation physical in 1975 his blood pressure was taken 2-3 times in one day and he recalled being told that it was elevated, but he could not recall if he was either started on treatment at that time, or directed to follow-up. 

It is clear from the Veteran's testimony (based on detailed review by the Board) that the specific details as to his blood pressure levels in the 1970s were not clear to him, which is understandable given the fact that the Veteran was attempting to recall events that had transpired approximately 30 years earlier. However, the fact remains that the service treatment records were recorded contemporaneously with the actual treatment sessions and therefore have a much greater likelihood of accuracy as to what the Veteran's blood pressure and diagnoses were at that time. See Curry v. Brown, 7 Vet. App. 59, 68 (1994) (noting that contemporaneous evidence has greater probative value than history as reported by a veteran). Therefore, the service treatment records are found to be more probative than the Veteran's current statements and recollections.

The Veteran did appear to agree that he first began receiving treatment for hypertension in the early 1980s. He also indicated that he was in the National Guard throughout the 1980s and was treated on a low-sodium diet. The Veteran asserted that his blood pressure was found uncontrolled in 1996. 

With regard to the Veteran's first period of service, the examiner noted that both the enlistment physical and separation physical were silent for diagnosis or treatment of hypertension. With regard to the second period of service, there was still no treatment for hypertension, the separation physical in September 1976 did not show hypertension and the VA examination report in February 1977 was silent for any diagnosis of or treatment for hypertension. Having reviewed the medical evidence of record, the examiner concluded that it was not at least as likely as not that the Veteran's hypertension was related to either of his first two periods of active service, as the evidence of record showed that the Veteran's was diagnosed with hypertension between 1984-1988 which did not overlap with any of his periods of active service, providing evidence against this claim. 

Thus, the weight of the evidence is against the conclusion that the Veteran's hypertension was either diagnosed, or manifested to 10 percent within a year of, either of his first two separations (1975 and 1976). Continuity of symptomatology has also not been shown. Hypertension was not diagnosed in service, the separation physical in September 1976 did not show hypertension and the VA examination report in February 1977 was silent for any diagnosis of or treatment for hypertension. Moreover, the VA examiner in June 2012 noted that the Veteran's hypertension was first diagnosed between 1984-1988. These medical reports serve to sever any continuity of symptomatology. Accordingly, presumptive service connection is not available for the Veteran's hypertension. 38 U.S.C.A. §§ 1101(3), 1112(a); 38 C.F.R. §§ 3.307(a), 3.309(a). 

Following separation in November 1976, the Veteran did not reenlist onto active duty for approximately sixteen years until June 1992. However, during this time, it appears that he developed hypertension. 

At his enlistment physical in July 1992, it was noted that the Veteran was taking daily prescribed medication for high blood pressure, and mild hypertension was assessed. The Veteran also reported on a medical history survey completed in conjunction with his enlistment physical that he had high blood pressure. The Veteran's blood pressure at the time of the physical was 158/106. As such, the evidence clearly shows that hypertension was noted at enlistment. 

A veteran is presumed to have been in sound condition when examined, accepted and enrolled for service, except as to defects, infirmities, or disorders noted at entrance into service, or where clear and unmistakable (obvious or manifest) evidence demonstrated that an injury or disease existed prior to service. Only such conditions as are recorded in examination reports are to be considered as noted. 38 C.F.R. § 3.304(b). 

However, where, as here, the induction examination notes a preexisting condition that is alleged to have been aggravated, the presumption of soundness does not apply. The presumption of aggravation of 38 U.S.C.A. § 1153 and the regulation implementing the statutory provision, 38 C.F.R. § 3.306, apply. In such a case, the burden falls on the Veteran to establish aggravation. Horn v. Shinseki, 25 Vet. App. 231, 235, Footnote 6 (2012). 

When considering whether a disorder has been aggravated by military service, temporary or intermittent flare-ups of a preexisting injury or disease are not sufficient to be considered "aggravation in service" unless the underlying condition, as contrasted with symptoms, has worsened. Jensen v. Brown, 4 Vet. App. 304, 306-307 (1993). Instead, "a lasting worsening of the condition," or a worsening that existed not only at the time of separation but one that still exists currently is required. Routen v. Brown, 10 Vet. App. 183, 189 (1997). Finally, aggravation may not be conceded where the disability underwent no increase in severity during service on the basis of all the evidence of record pertaining to the manifestations of the disability prior to, during, and subsequent to service. 38 U.S.C.A. § 1153; 38 C.F.R. § 3.306(b). The Federal Circuit has also concluded that the term "aggravation" has the same meaning both in sections 1111 (presumption of soundness) and 1153 (presumption of aggravation). Horn, 25 Vet. App. at 235. 
 
As such, the burden is on the Veteran to show that his hypertension was aggravated by his final period of active service from June 1992 to March 1994. Unfortunately, as will be discussed, the Veteran has not met this burden.

For example, a VA examiner concluded that the evidence of record clearly and unmistakably showed that the pre-existing hypertension was not aggravated by the Veteran's final period of military service. The examiner noted that during this third period of active service, the Veteran was evaluated for different medical conditions, but never for uncontrolled hypertension. The examiner noted that on several occasions, the Veteran was treated for mildly elevated blood pressure, but he was not treated for hypertension on those occasions, and the Veteran had not specifically presented for treatment on account of hypertension. The examiner documented five occasions when the Veteran's blood pressure was checked between June 1992 and March 1994, and it is it is noted that the final measurement was the lowest of the five (140/90), confirming that while his blood pressure may have fluctuated, it was not permanently aggravated. 140/90 is also significantly lower than the 158/106 which was shown at the enlistment physical for the third period of service, bolstering the conclusion that the Veteran's hypertension was not permanently aggravated by his final period of service.

This medical opinion is found to be highly probative. It was made with a fully informed view of the Veteran's medical history, and a rationale was provided for the opinion. Additionally, this opinion has not been contradicted, undermined, or questioned by any competent medical evidence. As such, the Board finds it entitled to great weight. Having reviewed the evidence, the Veteran has simply not met his burden to show that his hypertension was permanently aggravated by this third period of service, and therefore service connection is not warranted for hypertension based on that period of service. 

The Board acknowledges that the Veteran was in the Puerto Rico National Guard for a number of years, but he has not specifically alleged that his hypertension began during a period of active duty for training, only that it began while he was in the National Guard. However, as noted above, merely being in the National Guard when a condition such as hypertension is diagnosed is insufficient to warrant a grant of service connection. The Board has reviewed the evidence of record, but does not find evidence that suggests that the Veteran's hypertension was first diagnosed during a period of active duty for training. 

In 1996 the Veteran was on active duty for training for approximately 15 days; and he did submit a illness slip dated June 5, 1996, and signed by his unit commander, noting that he had been experiencing dizziness and nausea with possible high blood pressure for two days. The Veteran was remanded to his quarters for 24 hours. However, while this may have occurred on active duty for training, the fact remains that the Veteran's blood pressure on June 6 and June 7 was 140/80, 140/90, and 140/82; in July 1996 it was 150/100. That is, it was at a level comparable to those seen at separation from active service, and lower than blood pressure shown in September 1995 (170/110). On August 26, 1996, the Veteran was seen for uncontrolled arterial hypertension, and it was noted that he should follow up in 10 days. Fortunately, on September 4, 1996, it was noted that the Veteran had improved arterial hypertension.

In Smith v. Shinseki, 24 Vet. App. 40, 48 (2010), the Court stated that a claim for benefits based on aggravation of a preexisting condition during active duty for training required a claimant to show evidence " both that a worsening of a condition occurred during the period of active duty for training and that the worsening was caused by the period of active duty for training". 

Moreover, it is important to remember that it is a permanent aggravation. It cannot simply be an acute flare-up of the disease.

Reviewing the Veteran's treatment records, it is clear that his blood pressure has fluctuated. However, he has not shown that his hypertension, which has been clearly established as predating his time on active duty for training in 1996, was permanently aggravated by his active duty for training. Even if it became symptomatic on active duty for training, this is not enough to warrant service connection. Rather, it must be shown that such worsening was permanent and that it was beyond the natural progression of the condition. Neither has been shown here. As noted above, the Veteran's blood pressure has continued to fluctuate both before and after any treatment while on active duty for training. As such, service connection for hypertension is denied. Significant evidence is against this claim including, as noted above, some of the Veteran's prior statements. 

Cervical condition

The Veteran is seeking service connection for a cervical spine condition. In April 2007, he asserted that his cervical spine condition had worsened. He submitted an MRI report showing three disc bulges in his cervical spine. However, the Veteran has not submitted any evidence showing that this condition either began during or was otherwise caused by any period of active duty. He has likewise not suggested that his cervical spine began during a period of active duty for training or inactive duty for training. It is important to note that until a condition becomes "service connected", its level of severity or any worsening are generally a non-issue.

To start, the condition at issue, disc bulges in the cervical spine, is not a "chronic disease" listed under 38 C.F.R. § 3.309(a), therefore 38 C.F.R. § 3.303(b) does not apply. See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).
 
Turning to the claim on a direct basis, it is not disputed that the Veteran currently has a cervical spine disability, as one has clearly been shown by the radiographic images. However, as explained above, a current disability is but one of the requirements for service connection. It must also be shown that the current disability is somehow linked to the Veteran's military service. 

Here, service treatment records from each of the Veteran's three periods of active duty do not show any neck problems, any neck treatment, or any complaints of neck symptomatology. It is worth noting that the Veteran did seek out considerable medical treatment while in service, but did not mention any neck problems at any of the treatment sessions. The Veteran also underwent a number of physical examinations while in service but a cervical spine or neck disability was neither reported by the Veteran, nor diagnosed by any medical officer. 

Based on the evidence as a whole and the facts of this case, this is taken as a strong indication that the Veteran's neck disability did not begin during service; since he would be expected, given his willingness to seek medical attention, to seek treatment if he was experiencing neck problems.

While the Board is often prohibited from finding lay evidence not credible on the sole basis of a lack of contemporaneous records, silence in a record can sometimes be relied upon as contradictory evidence; specifically, the silence in record can be weighed against lay testimony if the alleged injury, disease, or related symptoms would ordinarily have been recorded in the medical record being evaluated by the fact finder. See Kahana v. Shinseki, 24 Vet. App. 428, 439 (2011) (Lance, J., concurring) (discussing credibility in relation to medical evidence); Fed. R. Evid. 803 (7) (the absence of an entry in a record may be evidence against the existence of a fact if such a fact would ordinarily be recorded). For this negative inference to be made, the Board must make two findings: first, that the record being evaluated is complete in relevant part; and, second, that the injury, disease, or related symptoms would ordinarily have been recorded had they occurred. The Board makes both findings in this case.
 
Following service, the Veteran continued to receive treatment for a number of conditions, but he did not mention any cervical spine problems for a number of years thereafter. For example, in October 1995, the Veteran complained of arthritis in his back, ankles, knees, hand and shoulders, but, very importantly, while citing these many problems, made no mention of his neck. Such facts provide some limited evidence against this claim. 

The first treatment record showing a neck disability was an MRI report from November 2003. This timeframe is consistent with the Veteran's assertion at his VA examination in 2010 that he had experienced neck problems for 6-7 years.
As a lay person, the Veteran is competent to report what comes to him through his senses. See Layno v. Brown, 6 Vet. App. 465 (1994). Accordingly, he is considered competent to report when he began experiencing neck pain. However, accepting the Veteran at his word would place the onset of his cervical spine disability several years after service, as his active duty service ended in 1994. 

This passage of time following service without any neck complaints or treatment weighs against the conclusion that the Veteran's current cervical spine disability was the result of his military service on a direct basis. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000) (holding that a lengthy period without medical complaints about a condition can be considered as a factor in resolving a claim). As noted, the Veteran has been willing to seek treatment for medical problems through the years, but he did not seek treatment for his neck for a number of years after service, and did not even report neck problems for years following service. 

In May 2010, the Veteran suggested that his cervical spine condition was secondary to his service connected back disability. However, he provided no medical opinion to support such an allegation, and the Veteran lacks the medical training and expertise to provide a complex medical opinion as to the etiology of a cervical spine disability. See Layno v. Brown, 6 Vet. App. 465 (1994), Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007). Therefore, while the Veteran disagrees with the conclusion that his cervical spine did not began during service, was not otherwise caused by service, and was not secondary to or aggravated by his back disability, his opinion is insufficient to provide the requisite nexus for this issue.

A VA examination was provided to investigate the Veteran's allegation that his service connected back disability caused his cervical spine condition, but in July 2010, the VA examiner concluded that the Veteran's cervical spine condition was not related pathophysiologically or anatomically to his service connected lumbar spine conditions. The examiner explained that they were from two distinct areas with different innervations and muscle biomechanics, independent from each other in their functions and motion. This opinion makes clear that the back disability did not cause or aggravate the Veteran's cervical spine disability, as the two conditions were anatomically separate.

The only medical opinion of record on the subject of the etiology of the Veteran's cervical spine disability found that it was unrelated to his back disability. The examiner provided a rationale for his conclusion and grounded it in the medical evidence of record. As such, this opinion is found to be highly probative and entitled to great weight.

The evidence of record shows that the Veteran's cervical spine disability began years after service, and no medical evidence of record has been submitted even suggesting that it began during, was otherwise caused by the Veteran's military service, or was caused or aggravated by a service connected disability. As such, the criteria for service connection have not been met and the Veteran's claim is denied. 

Erectile dysfunction and urinary incontinence
 
In May 2010, the Veteran filed a claim for service connection for erectile dysfunction and urinary incontinence, both of which he alleged were secondary to his service connected back disability. However, the Veteran provided no evidence to support such an assertion in his claim, notice of disagreement, or substantive appeal. Moreover, the Veteran lacks the medical training and expertise to provide a complex medical opinion as to the etiology of a genitourinary disability (such as erectile dysfunction or urinary incontinence). See Layno v. Brown, 6 Vet. App. 465 (1994), Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007). 

It is also noted that neither erectile dysfunction nor urinary incontinence are "chronic diseases" listed under 38 C.F.R. § 3.309(a), therefore 38 C.F.R. § 3.303(b) does not apply. See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).
 
Service treatment records are silent for any complaints of or treatment for urinary incontinence or erectile dysfunction. 

In September 1999, several years after separation, the Veteran was trained and oriented in using a vacuum device to obtain an erection. He was also diagnosed with erectile dysfunction at a VA spine examination in July 2010. However, at that examination the Veteran specifically denied experiencing any bowel or bladder dysfunction.

The Board finds that evidence of a present disability has not been presented in the case of the Veteran's reported urinary incontinence. As noted, the Veteran has on several occasions denied any bowel or bladder incontinence or dysfunction (for example, in an August 2007 VA treatment record it was noted that the Veteran did not have any bowel or bladder problems) and the examiner in August 2010 specifically found no current disability diagnosed by urinary incontinence. Likewise the VA treatment records do not show urinary incontinence. For example, in August 2011 and February 2012, the medical professional specifically found urinary incontinence was not present. In the absence of proof of a present disability, there can be no valid claim. Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992). Accordingly, the Veteran's claim of entitlement to service connection for urinary incontinence is denied. 

In any event, even if the Board assumes the Veteran has this problem, in August 2010, the Veteran underwent a VA genitourinary examination. He stated that his erectile dysfunction began in approximately 2003 and had gotten progressively worse. With regard to urinary incontinence, the examiner noted that the Veteran complained of dribbling, but was not receiving any treatment for it. The Veteran's bladder and urethra were normal on examination and the Veteran had normal perineal sensation. The examiner concluded that the Veteran did not have a disability manifested by urinary incontinence. The examiner also concluded that it was less likely than not that the Veteran's erectile dysfunction was caused by or a result of his back disability. The examiner explained that the nerves that were responsible for the penial erection did not come from the segments of the spinal cord.

While the examiner did not specifically indicate that the Veteran's erectile dysfunction was not aggravated by his back disability, there has been no such allegation advanced. Here, the examiner explained that there was simply no cause and effect relationship between the back and the erectile dysfunction, and without such a cause and effect relationship, one system would not impact the other system. As it has been found that there is simply no connection at all between the two problems, there is simply no basis to find one disability aggravated another. 

Given that no competent evidence has been advanced even suggesting that the Veteran's erectile dysfunction was related to either his military service or his service connected back disability, the criteria for service connection for erectile dysfunction have not been met, and the Veteran's claim is denied.

Knees

The Veteran is currently seeking service connection for bilateral knee disabilities, which he sought as secondary to his service connected back disability. The Veteran had three periods of active military service: November 1973-November 1975, March 1976-November 1976, and June 1992-March 1994.

Service treatment records show that in June 1976, the Veteran sought treatment for problems with his right knee. It was noted that the pain had begun two days earlier and had not been accompanied by swelling. He was assessed with a mild knee strain. On a medical history survey completed in September 1976, the Veteran reported having experienced trick or locked knees, but a physical examination found his lower extremities to be normal. Moreover, following service, the Veteran began seeking service connection for his back and ears, but did not pursue any knee claim. 

On his separation physical in March 1979 the Veteran's lower extremities were found to be normal, and he specifically denied any history of knee problems on a medical history survey completed in conjunction with his separation physical. On a periodic examination in May 1983, the Veteran's lower extremities were again found to be normal. 

Additionally, on an enlistment physical in July 1992, the Veteran's lower extremities were found to be normal, and the Veteran specifically denied any knee problems, although he acknowledged having symptoms of arthritis off and on. Because the Veteran was examined prior to entry and found to have normal lower extremities, he is entitled to the presumption of soundness with regard to his knees bilaterally with regard to this third and final period of active service.

As will be discussed, during this third period of active service, the Veteran was diagnosed with arthritis in both knees, which is a "chronic disease" listed under 38 C.F.R. § 3.309(a), therefore 38 C.F.R. § 3.303(b) is applicable. See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).
 
Service connection may be established with certain chronic diseases, including arthritis, based upon a legal presumption by showing that the disorder manifested itself to a degree of 10 percent disabling or more within one year from the date of separation from service. Such disease shall be presumed to have been incurred in service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307, 3.309(a). While the disease need not be diagnosed within the presumption period, it must be shown, by acceptable lay or medical evidence, that there were characteristic manifestations of the disease to the required degree during that time.

Specifically, in January 1993, the Veteran presented for treatment with complaints of right knee pain for two weeks without trauma, but following exercise. He was diagnosed with osteoarthritis of the right knee. A body scan in January 1993 reportedly showed findings of an acute arthritis inflammatory process in the left knee; in a December 1993 treatment record the Veteran was noted to have osteoarthritis and degenerative joint disease of the left knee. In December 1993, the Veteran was given a physical profile for osteoarthritis in his left knee.

Less than a year after separation, in November 1994, the Veteran was assessed with osteoarthritis in the knees. The medical professional noted that the Veteran had first been seen in December 1993 (that is, during active duty) with insidious onset of pain in the knees with gradual worsening. In December 1994, the Veteran complained of pain in his knees. In February 1995, x-rays of the Veteran's knees showed minimal degenerative joint disease but were otherwise unremarkable. In August 1995, osteoarthritis of the knees was assessed once again. On a medical history survey completed in March 1996, the Veteran acknowledged knee problems.

It is also noted that the regulations explain that because painful motion is an important factor of disability; and joints that are actually painful, unstable, or malaligned, due to healed injury, should be entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. Here, the Veteran has reported pain in both knees, meaning that they would warrant at least the minimum compensable rating for each joint. Furthermore, because a chronic presumptive disease, arthritis, was diagnosed in both knees either during service, or within a year of service, the criteria for service connection have been met. Therefore, service connection for arthritis in both knees is granted.

It is noted that the Veteran also had a meniscal tear in his right knee which was diagnosed several years after service. Specifically, in September 1997, it was noted that the Veteran had a right knee meniscus tear without any history of trauma. The Veteran described right knee swelling, knee locking and knee pain since May 1997. In January 1998, the Veteran reported that he had begun to experience swelling and pain in his right knee one year earlier. As such, the credible lay testimony given to the doctors clearly places the onset of the symptoms, which led to the diagnosis of a meniscal tear, several years after military service; and there is no suggestion that the meniscal tear in the right knee either began during or was otherwise caused by the Veteran's military service. Furthermore, a meniscus tear is not a "chronic disease" listed under 38 C.F.R. § 3.309(a), therefore 38 C.F.R. § 3.303(b) does not apply. See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). As such, to the extent that the symptoms attributable to the Veteran's meniscus tear can be separated from the symptomatology attributable to his right knee degenerative joint disease, service connection for any residuals of the meniscal tear in the right knee is denied. 

II. Duties to Notify and Assist 

Under applicable criteria, VA has certain notice and assistance obligations to claimants. See 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a). 
 
Notice must be provided to a claimant before the initial unfavorable agency of original jurisdiction (AOJ) decision on a claim for VA benefits and must: (1) inform the claimant about the information and evidence not of record that is necessary to substantiate the claim; (2) inform the claimant about the information and evidence that VA will seek to provide; and (3) inform the claimant about the information and evidence the claimant is expected to provide. Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004) (Pelegrini II). With respect to service connection claims, a section 5103(a) notice should also advise a claimant of the criteria for establishing a disability rating and effective date of award. Dingess/Hartman v. Nicholson, 19 Vet. App. 473, 486 (2006). 

In the present case, required notice was provided by letters dated in May 2001, December 2007, and June 2010, which informed the Veteran of all the elements required by the Pelegrini II Court as stated above. Several of these letters also informed the Veteran how disability ratings and effective dates were established. Under these circumstances, the Board finds that the notification requirements of the VCAA have been satisfied as to content. 

The Board finds that any defect concerning the timing of the notice requirement was harmless error. Although the entirety of the notice provided to the Veteran was not given prior to the first adjudication of the claim, the Veteran has been provided with every opportunity to submit evidence and argument in support of his claim and ample time to respond to VA notices. See Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, 444 F.3d 1328 (Fed. Cir. 2006). Additionally, the Veteran's claim was readjudicated following completion of the notice requirements. 

Based on the foregoing, the Board finds that the Veteran has not been prejudiced by any failure of VA in its duties to notify and assist him, and that any such violations could be no more than harmless error. See Conway v. Principi, 353 F.3d 1369 (Fed. Cir. 2004). In any event, the Veteran has neither alleged, nor demonstrated, any prejudice with regard to the content or timing of VA's notices or other development. See Shinseki v. Sanders, 129 U.S. 1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination). Thus, adjudication of his claim at this time is warranted. 
 
As to VA's duty to assist, the Board finds that all necessary development has been accomplished, and therefore appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993). Service treatment records, private treatment records, VA treatment records, and SSA records have all been obtained. Additionally, the Veteran was offered the opportunity to testify at a hearing before the Board, but he declined. VA has also translated a number of documents from Spanish into English.

The Veteran was also provided with several VA examinations (the reports of which have been associated with the claims file), including examinations of the spine, genitourinary tract, knees, and hypertension. The Board finds the examinations were thorough and adequate and provide a sound basis upon which to base a decision with regard to each of the Veteran's claims. Moreover, neither the Veteran nor his representative has voiced any disagreement with the adequacy of any of the examinations or opinions.

As described, VA has satisfied its duties to notify and assist, and additional development efforts would serve no useful purpose. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994). Because VA's duties to notify and assist have been met, there is no prejudice to the Veteran in adjudicating this appeal.
 
ORDER

Service connection for hypertension is denied.

Service connection for disc bulges at C3-C4, C4-C5, and C5-C6 (cervical condition), to include as secondary to the Veteran's service connected back disability, is denied. 

Service connection for erectile dysfunction, to include as secondary to the Veteran's service connected back disability, is denied. 
 
Service connection for urinary incontinence, to include as secondary to the Veteran's service connected back disability, is denied. 

Service connection for arthritis of the right knee is granted. 

Service connection for residuals of a meniscus tear of the right knee is denied.

Service connection for a left knee disability is granted. 


REMAND

In May 2010, the Veteran filed a claim seeking service connection for neuropathy of his bilateral lower extremities secondary to his service connected back disability. The RO subsequently added claims for service connection for neuropathy of the Veteran's bilateral upper extremities.

In July 2010, the Veteran underwent a VA peripheral nerves examination at which the examiner concluded that he had peripheral neuropathy in his upper and lower extremities which was the result of his non-service connected diabetes mellitus or thyroid disease. 

At a spine examination in July 2010, the Veteran complained of radiating pain from his back and neck. Additionally, VA treatment records consistently list lumbar radiculopathy as one of the Veteran's medical problems, and he has also been diagnosed with cervical radiculopathy. For example, EMG/NCV testing in 2003 and 2007 suggested lumbar and cervical radiculopathy.

The Board acknowledges that service connection has been denied for the Veteran's cervical spine disability by this decision. However, as discussed above, it is unclear whether the symptoms in the Veteran's extremities are related to peripheral neuropathy as a result of a non-service connected disability, or to radiculopathy or another neurologic impairment that would be secondary to his service connected back disability. As such, medical clarification is necessary.

Additionally, the issue of TDIU is inextricably intertwined with the adjudication of the other remanded issue, and therefore it too will be remanded.

Accordingly, the case is REMANDED for the following action:

1. Provide the Veteran's claims file to a VA examiner. If the examiner determines that the Board's questions cannot be answered without an examination and/or testing, such should be scheduled. A complete rationale should be provided for any opinion expressed. The examiner should determine whether it is at least as likely as not (50 percent or greater) that the Veteran has a neurologic disability (to include radiculopathy) impacting his upper and/or lower extremities that is the result of his service connected back disability. 

In so doing, the examiner should take note of the fact that the Veteran was diagnosed with peripheral neuropathy of the upper and lower extremities at a VA examination in 2010 which was felt to be secondary to either diabetes mellitus or to a thyroid condition. The examiner should also acknowledge the fact that the Veteran appears to have been diagnosed with radiculopathy in the upper and lower extremities on testing in 2003 and 2007. In providing the opinion, the examiner should explain whether the neurologic symptoms the Veteran has been reporting since May 2010 are simply manifestations of a neurologic disability attributable to his back disability, or whether they were actually symptoms of peripheral neuropathy that had been misdiagnosed as radiculopathy. The examiner is also reminded that no disability of the cervical spine has been service connected in the Veteran's case.

2. A medical opinion should also be obtained to determine the functional impairment caused by the Veteran's service-connected back disorder, knee disorder, any neurologic disorder attributed to his back disorder, tinnitus, otitis/otomycosis, and mild gastritis as a whole. If an examination is necessary, one should be scheduled. The examiner should provide this opinion considering the Veteran's education and occupational experience, but irrespective of age and any nonservice-connected disabilities. 

3. After completing the requested actions, and any additional notification and/or development deemed warranted, readjudicate the remaining claims on appeal. If the Veteran does not meet the percentage requirements for a TDIU under 38 C.F.R. § 4.16(a), consideration must be given to whether referral for extraschedular consideration is warranted. If any benefit sought remains denied, furnish the Veteran and his representative a supplemental statement of the case and afford them an opportunity to respond before the record is returned to the Board for future review.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112.


______________________________________________
JOHN J. CROWLEY 
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs